**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ADRIAN MIRANDA, an individual,
*Plaintiff-Appellant*,

v.

CITY OF CASA GRANDE, a
municipality; RICHARD RUSH, in his
individual capacity as an Officer of
the Casa Grande Police Department,
*Defendants-Appellees.*

No. 20-16905

D.C. No.
2:19-cv-04618-
JJT-JZB

OPINION

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted June 15, 2021
San Francisco, California

Filed October 19, 2021

Before: Sidney R. Thomas, Chief Judge, and Daniel A.
Bress and Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Bress

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment in favor of defendants in an action brought pursuant to 42 U.S.C. § 1983 alleging that a City of Casa Grande police officer lied during an Arizona state administrative proceeding concerning the suspension of plaintiff's driver's license.

The panel first noted that there is no express constitutional guarantee or other federal right to a driver's license, so that its deprivation does not violate substantive due process. Plaintiff's claim therefore sounded, if at all, in procedural due process. The panel held that plaintiff failed to demonstrate a procedural due process violation because, even assuming the officer testified falsely at the administrative hearing as to whether plaintiff consented to a blood test following his arrest for driving under the influence, Arizona provided sufficient post-deprivation process to plaintiff. The panel noted that, following the discovery of the officer's alleged unauthorized conduct, plaintiff was granted a second administrative hearing before a new ALJ, who ultimately voided the suspension and reinstated plaintiff's license. Additionally, Arizona also allowed plaintiff to bring a state law claim, which he was pursuing in Arizona state court. The panel held that the post-deprivation procedures were both meaningful and sufficient under the Due Process Clause.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Joel B. Robbins (argued), Robbins & Curtin PLLC, Phoenix, Arizona, for Plaintiff-Appellant.

Larry J. Crown (argued) and Elan S. Mizrahi, Titus Brueckner & Levine PLC, Scottsdale, Arizona, for Defendants-Appellees.

**OPINION**

BRESS, Circuit Judge:

The question in this case is whether the plaintiff can pursue a claim under 42 U.S.C. § 1983 for a police officer allegedly lying during an Arizona state administrative proceeding concerning the suspension of the plaintiff's driver's license. The answer, we hold, is no. Even assuming the officer testified falsely, Arizona provided sufficient post-deprivation process to the plaintiff. That is enough to foreclose the plaintiff's procedural due process theory, and thus, his § 1983 claim.

I

A

On July 6, 2017, Adrian Miranda went out bowling with two neighbors, his 14-year-old daughter, and his 17-year-old son Adrian Matthew Miranda (whom the parties refer to as Matthew). Over the course of the night, Miranda drank at least six beers. Miranda was by that point significantly intoxicated, so Matthew drove the group home in Miranda's truck. During the ride, Miranda and his son began to argue. The argument intensified until Matthew stopped the truck in

a vehicle lane of traffic several blocks from the family's home. Neighbors heard the commotion and called 911.

Officers Richard Rush and John Campa of the Casa Grande, Arizona Police Department responded to the scene. When they arrived, the truck was still in the vehicle lane of traffic and Miranda was now in the driver's seat. The parties dispute whether the truck was running, whether Miranda had the keys, whether the truck's alarm was going off, and whether the emergency blinkers were flashing.

The officers ordered Miranda out of the truck, but he did not comply. They repeated the command over a loudspeaker for several minutes until Miranda finally exited the vehicle. Miranda emerged with bloodshot eyes, stumbling and swaying, smelling of alcohol, and slurring his speech. Officer Rush's police report described Miranda's behavior that evening as "extremely uncooperative" and "belligerent."

Officer Rush arrested Miranda for failure to comply with law enforcement and had him brought to the Casa Grande police station. At the station, Miranda admitted to having consumed six beers and he performed poorly in response to a field sobriety test. He also submitted to a portable breath test, which revealed a blood alcohol content of 0.137%. Miranda was placed under arrest for driving under the influence (DUI).

Under Arizona's "implied consent" law, "[a] person who operates a motor vehicle in this state gives consent . . . to a test or tests of the person's blood," if arrested on suspicion of a DUI. A.R.S. § 28-1321(A). This applies if "the person was driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor or drugs." *Id.*

Once arrested, the violator "shall be requested" to submit to a blood test, and, if he refuses, he "shall be informed that [his] license or permit to drive will be suspended or denied for twelve months, . . . unless the violator expressly agrees to submit to and successfully completes the test or tests." *Id.* § 28-1321(B). "A failure to expressly agree to the test or successfully complete the test is deemed a refusal." *Id.* At that point, officers generally need a search warrant before they can continue with the blood test. *Id.* § 28-1321(D)(1).

Officer Rush read to Miranda from a standardized Arizona Department of Transportation "implied consent affidavit" designed to confirm whether an individual is consenting to required tests. The first paragraph of the affidavit asks, "Will you consent to a test or tests of your blood, breath, urine or other bodily substance for the purpose of determining your alcohol concentration or drug content?" Officer Rush read this question verbatim and Miranda responded, "No, I will not."

Following the next prompt on the form, Officer Rush then advised Miranda: "If you do not expressly agree to testing or do not successfully complete the tests, your Arizona driving privileges will be suspended for 12 months. . . . Will you consent to the tests?" Miranda refused again. Officer Rush then read Miranda one last warning from the form affidavit: "You are not entitled to further delay before taking the tests. Any additional delay will be considered a refusal to submit to the tests. Will you consent to the tests?" For the third time, Miranda refused.

Miranda then asked to make a phone call. The officers, unsure if Miranda was requesting a lawyer, allowed him to use a phone. But instead of calling a lawyer, Miranda called his superior at the United States Customs & Border Patrol (CBP), where Miranda worked as a CBP Officer. Miranda

told his supervisor that he was intoxicated at the police station and needed to be picked up.  After the call, Miranda fell asleep.

Meanwhile, Officers Rush and Campa had begun preparing a search warrant for Miranda's blood draw. During this time, another officer, Officer McKinney, was sitting with Miranda.  Video recordings from inside the police station recorded the following exchanges.  While they were in the room together, Miranda stated to McKinney, "Can you let them know I'm doing the blood work?"  Officer McKinney then found Officer Rush, who had not yet secured the search warrant.  McKinney said to Rush, "He says he's doing bloodwork."  Rush asked, "He said he's doing bloodwork?"  McKinney replied, "Yes."  Rush responded, "Oh, no shit."  "Yep," said McKinney.

After this exchange, Officer Rush still obtained a telephonic search warrant from a judge on the Casa Grande Justice Court.  Rush returned to the room and told Miranda: "So, you refused the blood draw, so your license is suspended for one year from this day forward."  Eventually, with the assistance of a phlebotomist (and after some resistance from Miranda), Miranda's blood draw was completed.  The test revealed a blood alcohol concentration above the legal limit for driving or physically controlling a motor vehicle in Arizona.

Miranda was charged with a DUI and various other crimes.  CBP limited Miranda's duties for a time, both because of Miranda engaging in "conduct unbecoming an officer and misuse of his position" and because Miranda, now lacking a valid driver's license, no longer met a condition of employment.  Among other things, CBP suspended Miranda's enforcement authority, ordered him to turn in his firearm and badge, and limited his building access

"only to those areas necessary to perform administrative duties." Miranda's pay was reduced, and he allegedly suffered anxiety, shame, and humiliation.

Miranda later pleaded guilty to disorderly conduct and failure to comply with law enforcement in exchange for dismissal of the DUI. His other charges were also ultimately dismissed.

B

Arizona law afforded Miranda the opportunity to contest his driver's license suspension in a hearing before a state administrative law judge (ALJ) in the Arizona Department of Transportation. *See* A.R.S. §§ 28-1321(G)–(K); Ariz. Admin. Code § 17-1-502; *see generally Tornabene v. Bonine ex rel. Arizona Highway Dep't*, 54 P.3d 355, 360–61 (Ariz. Ct. App. 2002). A timely request for a hearing stays the driver's license suspension until the hearing is held. A.R.S. § 28-1321(J).

Miranda sought such a hearing, which took place on September 12, 2017. Miranda, represented by counsel, testified that he had no memory of the evening. Miranda at this point did not know he had expressed a willingness to allow a blood draw, nor was he aware of the conversation between Officers McKinney and Rush. At the hearing, Miranda's son, daughter, and stepson testified on his behalf. Officer Rush also testified. The ALJ asked Rush, "At any point before the service of the warrant did the petitioner change his mind and tell you that he would take the test?" Rush responded, "No, ma'am."

The ALJ found Rush "sufficiently credible" in his testimony. The ALJ also found that Miranda declined to submit to the blood test and that he did not change his mind

before service of the warrant.  The ALJ suspended Miranda's license for twelve months, effective October 12, 2017.

Some time later, CBP obtained the Casa Grande Police Department surveillance videos, seemingly as part of assessing Miranda's employee discipline for the night in question.  Miranda was at that point made aware of the videos.  After seeing that he had expressed to McKinney his willingness to undergo a blood draw, Miranda sought a second administrative hearing.  This hearing took place on July 12, 2018, before a different ALJ.  Counsel once again represented Miranda at the second hearing.

Officer Rush testified again, too.  When questioned about the videotaped exchange with Officer McKinney, Rush said, "[i]t's not a recant" because Miranda "didn't expressly agree to do the test."  Rush "d[idn't] know what . . . Miranda meant when he said, 'He would do the bloodwork.'"  Rush elaborated: "[T]hat means nothing to me.  He is not expressively saying that he will take the blood test.  I've done tons of DUI's—this is what I do. . . . [H]e adamantly denied and said that he did not want to take the test over and over again."

The second ALJ also determined that Miranda had initially refused to consent to the blood test.  But this time, the ALJ found that Officer McKinney's statements were "a clear advisement" that Miranda had recanted his refusal before Officer Rush obtained the search warrant.  Although the ALJ did not determine that Rush had testified falsely during the first administrative hearing, she found that Miranda had in the end voluntarily submitted to the blood draw.  The second ALJ thus voided Miranda's license suspension.

## C

In July 2018, Miranda sued the City of Casa Grande and Officer Rush in Arizona state court. In addition to raising several state law claims, Miranda's complaint alleged a 42 U.S.C. § 1983 count against Rush. The § 1983 claim was titled "Violation of Fourteenth Amendment Rights; Wrongful Initiation of Civil Proceedings." Miranda alleged that Rush "knew that [Miranda] had consented to the blood test," yet still "initiated and pursued" the license suspension. Miranda also alleged that Rush "lied under oath" to the ALJ, and that Rush's "false testimony at the administrative hearing also caused a deprivation of [Miranda's] right to procedural due process under the Fourteenth Amendment."

The defendants removed the case to federal court. Later, they filed a motion for summary judgment on all claims. The district court granted summary judgment on the § 1983 claim, concluding that Miranda had not shown an underlying constitutional violation. The court then remanded the remaining state law claims to state court. On appeal, Miranda argues that Officer Rush's "deliberately false testimony" violated due process because it led to the temporary suspension of his driver's license.

## II

We review de novo a district court's order granting summary judgment, examining the evidence in the light most favorable to Miranda, the non-moving party. *Badgley v. United States*, 957 F.3d 969, 974 (9th Cir. 2020). We may affirm the district court on any ground supported in the record. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008).

To prevail under § 1983, Miranda must at minimum prove the violation of a federal or constitutional right. *See Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). There is, of course, no express constitutional guarantee or other federal right to a driver's license. And while Miranda disclaimed reliance on a substantive due process theory in the district court, we have also previously held that "a driver's license is not a fundamental right," so that its deprivation does not violate substantive due process. *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018); *see also Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) ("Miller provides no precedent supporting his contention that, absent a lack of due process, denial of a driver's license is tantamount to denial of a constitutional right.").

Miranda's claim thus sounds, if at all, in procedural due process. But we hold that Miranda has not demonstrated a procedural due process violation here.

## A

A procedural due process claim has two elements: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Franceschi*, 887 F.3d at 935 (quoting *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001)). It has long been understood that "the Due Process Clause applies to the deprivation of a driver's license by the State." *Dixon v. Love*, 431 U.S. 105, 112 (1977). Arizona thus may not deprive Miranda of his driver's license "without [the] due process required by the Fourteenth Amendment." *Franceschi*, 887 F.3d at 935 (citing *Bell v. Burson*, 402 U.S. 535, 539 (1971)).

But to say that the deprivation of a driver's license can implicate procedural due process protections does not

resolve the level of protection that must be afforded. The touchstone of procedural due process is notice and an opportunity to be heard. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). Yet "[d]ue process is a flexible concept that varies with the particular situation." *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017) (quoting *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015)). Therefore, what the Due Process Clause "requires in any given case is a function of context." *Franceschi*, 887 F.3d at 935 (quoting *Brewster v. Bd. of Educ.*, 149 F.3d 971, 983 (9th Cir. 1998)).

In *Dixon v. Love*, for instance, the Supreme Court held that in the case of a driver with repeated convictions for traffic offenses, a state could suspend a driver's license without any pre-revocation hearing at all, as long as post-revocation procedures were available. 431 U.S. at 112–15; *see also Franceschi*, 887 F.3d at 935–36 (rejecting a procedural due process challenge to California's scheme suspending driver's licenses of certain delinquent taxpayers); *Aiona v. Judiciary of Haw.*, 17 F.3d 1244, 1249–50 & n.9 (9th Cir. 1994) (rejecting a procedural due process objection to Hawaii's driver's license revocation scheme).

The immediate problem Miranda encounters with any procedural due process claim is that he received considerable process. At the police station, Officer Rush read to him from a standardized form designed to confirm that he was not expressly consenting to a blood draw (and to minimize error in that determination). Although many § 1983 litigants justifiably complain about police failing to obtain a warrant, here Rush secured a warrant for a blood draw through a judge on the Casa Grande Justice Court. While Miranda protests that this warrant was unnecessary because he had consented to the blood draw, Rush points out that nothing prevented him from seeking a warrant regardless, and there

can be little doubt that the warrant was supported by probable cause.

Once Rush determined that Miranda failed expressly to consent to a blood draw and that his license should therefore be suspended, Arizona law afforded Miranda an opportunity to challenge that suspension before a state ALJ. *See* A.R.S. §§ 28-1321(F)–(K); Ariz. Admin. Code § 17-1-502. Miranda took full advantage of this process, with the assistance of counsel and witnesses. And he raises no due process challenge to Arizona's procedures themselves.

Instead, Miranda's contention is that Officer Rush testified falsely at the first ALJ hearing about whether Miranda had recanted his refusal to submit to the blood draw, and that this alleged lie standing alone formed a procedural due process violation when it led to his license being temporarily suspended. Miranda is incorrect.

In *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court explained that meaningful post-deprivation remedies will suffice when the deprivation was the "result of a random and unauthorized act by a state employee." *Id.* at 541. When there is a "necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process," "postdeprivation remedies made available by the State can satisfy the Due Process Clause." *Id.* at 538–39. A state employee acting in an unauthorized manner fits that situation, the Supreme Court held, because "[i]n such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur." *Id.* at 541.

*Parratt* involved a state employee's allegedly negligent conduct. In *Hudson v. Palmer*, 468 U.S. 517 (1984), the

Supreme Court extended *Parratt*'s logic to an official's intentional misconduct. In *Hudson*, an inmate alleged that prison guards had maliciously destroyed his personal belongings, depriving him of property without due process. *Id.* at 530–32. The Supreme Court explained that "[t]he underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Id.* at 533. That reasoning, *Hudson* held, applied with even more force to intentional deprivations:

> The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct. Arguably, intentional acts are even more difficult to anticipate because one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signalling his intent. If negligent deprivations of property do not violate the Due Process Clause because predeprivation process is impracticable, it follows that intentional deprivations do not violate that Clause provided, of course, that adequate state post-deprivation remedies are available.

*Id.*[1]

---

[1] The Supreme Court later overruled the portion of *Parratt* that allowed an official's merely negligent conduct to serve as the basis for a claimed constitutional violation. *See Daniels*, 474 U.S. at 331

We think *Hudson* provides the proper fit here.  Officer Rush, to be sure, strongly resists Miranda's allegation that he lied in the first ALJ hearing, with Rush maintaining that his perception of the chaotic events was reasonable.  But assuming without deciding that Rush did lie, that conduct can only be described as "unauthorized" under *Hudson*.  *Id.* Miranda himself argues in his briefing that "Rush abused the authority of his position and undermined the safeguards owed to Miranda," suggesting Rush did so to "punish plaintiff for working for the 'Feds.'"  That is akin to the "unauthorized personal vendetta" at issue in *Hudson*.  *Zinermon v. Burch*, 494 U.S. 113, 130 (1990).  As in *Hudson*, Rush (by Miranda's allegations) was "bent upon effecting the substantive deprivation and would have done so despite any and all predeprivation safeguards." *Id.* at 137.

Indeed, the conclusion that Rush's conduct was unauthorized is, if anything, stronger here than in *Hudson* itself because Rush engaged in alleged wrongdoing notwithstanding the fact that Arizona *had* put in place various pre-deprivation safeguards for driver's license suspensions—procedures whose adequacy Miranda does not challenge here.  Whereas *Hudson* involved no pre-deprivation process at all, *see* 468 U.S. at 519–20, Rush's alleged misconduct took place within a defined state process that included a neutral arbiter and various other protections traditionally designed to secure the truth (availability of counsel, cross-examination, witnesses under oath, etc.).  Rush was not even the final decisionmaker here; the ALJ

---

("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials . . . .").  But nothing in *Daniels* disturbed *Parratt*'s determination that a State could remedy the unauthorized action of a government official through adequate post-deprivation processes.

was.  Nor does Miranda suggest additional procedures, much less reasonable ones, that would reliably prevent dishonest testimony.  (To the extent Miranda claims a related procedural due process violation arising from Officer Rush's allegedly misleading phone call seeking a warrant, that too was "unauthorized," and the same analysis above applies.)

In short, Miranda provides no basis to conclude that Rush's alleged intentional misconduct was authorized, much less that it was predictable or reasonably avoidable.  *Cf. Zinermon*, 494 U.S. at 136–39 (requiring pre-deprivation process when the alleged wrongdoing was "foreseeable," when it might have "averted" the deprivation, and when the defendants under state law had "authority to effect the very deprivation complained of here").  For unauthorized deprivations like this one, "the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy."  *Hudson*, 468 U.S. at 533.  To determine whether Miranda has made out a procedural due process claim, the proper inquiry thus turns on the procedures the State afforded Miranda after his initial license suspension.

There can be no serious question that those post-deprivation procedures were both meaningful and sufficient under the Due Process Clause.  When Miranda discovered the station house videos, he was granted a second administrative hearing.  At this hearing, he had the opportunity to present new evidence and arguments before a new ALJ, who ultimately voided the suspension and reinstated Miranda's license.  "A violation of procedural rights requires only a procedural correction, not the reinstatement of a substantive right . . . ."  *Raditch v. United States*, 929 F.2d 478, 481 (9th Cir. 1991).  Here, however, Miranda received both.

On top of this, Arizona also allows Miranda to bring state law claims, which he is presently pursuing against Rush and the City of Casa Grande in Arizona state court. *See, e.g.*, *Barnett v. Centoni*, 31 F.3d 813, 816–17 (9th Cir. 1994) (per curiam) (concluding that state tort law provided an adequate post-deprivation remedy for an unauthorized property loss); *King v. Massarweh*, 782 F.2d 825, 827 (9th Cir. 1986) (concluding that when officers "did not act in accordance with established state procedures but instead acted in violation of police procedures promulgated by the San Francisco Police Department," their conduct was unauthorized and plaintiffs were "relegated to the post-deprivation remedies available through the civil tort law process for their due process claims").

Whether or not Miranda proves successful in state court, the availability of potential state tort remedies supports our view that Arizona has provided Miranda with adequate post-deprivation process. Miranda protests that punitive damages are not available through his state law claims. But that Miranda "might not be able to recover under these remedies the full amount which he might receive in a § 1983 action is not . . . determinative of the adequacy of the state remedies." *Hudson*, 468 U.S. at 535.

Because Arizona has provided Miranda with sufficient post-deprivation mechanisms, Miranda cannot demonstrate a procedural due process violation and has "received all the process that was due." *Raditch*, 929 F.2d at 480. Accepting Miranda's contrary position, meanwhile, would be both inconsistent with governing precedent and potentially dramatic in its implications, threatening to turn nearly every mishap or misdeed in a state administrative process into a federal constitutional violation. The Supreme Court has long cautioned that we should not make "the Fourteenth Amendment a font of tort law to be superimposed upon

whatever systems may already be administered by the States." *Daniels*, 474 U.S. at 332 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). In the case of a deprivation resulting from a flawed state proceeding of the type at issue here, what matters under the Due Process Clause is not merely the initial deprivation itself but whether the State has set up adequate procedural protections surrounding it. Here, we conclude that Arizona's post-deprivation processes are sufficient. Miranda's § 1983 claim thus fails.[2]

### B

Against the weight of this reasoning, Miranda maintains that two of our cases require a different conclusion. He points specifically to *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), and *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010). But these cases involve substantive due process rights, and present other important differences as well. Neither case supports Miranda's assertion that Officer Rush's alleged misconduct creates a due process violation regardless of the post-deprivation remedies available under Arizona law.

In *Devereaux*, a foster parent brought a § 1983 claim alleging that police had used improper interrogation techniques against his foster children, leading to false criminal charges for child abuse. 263 F.3d at 1076–80. We identified in that case "a clearly established constitutional due process right not to be subjected to criminal charges on

---

[2] We thus have no occasion to address whether Rush would be entitled to any form of official immunity under § 1983, an issue that the district court did not reach.

the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074–75.

That holding does not govern here. Unlike *Devereaux*, Miranda's alleged deprivation does not arise from a criminal proceeding. And the considerations that apply to a potential deprivation of liberty do not automatically carry over to the temporary suspension of a driver's license. In addition, and although *Devereaux* did not clearly identify the source of the constitutional right it identified, we have later described it as grounded in substantive due process. *See Hall v. City of Los Angeles*, 697 F.3d 1059, 1068–69 (9th Cir. 2012); *see also Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013) (same). As we have explained above, Miranda's claim sounds, if at all, in procedural due process. The considerations that bear on a claim founded in a substantive due process right do not invariably translate over to the procedural due process context, given the different interests at stake.

Finally, to support the claim *Devereaux* allowed, the plaintiff

> must, *at a minimum*, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

*Devereaux*, 263 F.3d at 1076. Even giving Miranda's view of the facts its widest berth, this case does not meet or

approximate either of *Devereaux*'s requirements, whether in kind or in severity.

*Costanich* also does not aid Miranda. In that case, a foster parent brought a § 1983 claim against a social worker for falsifying evidence, which led to the plaintiff losing her foster care license and custody of her foster children. 627 F.3d at 1110. The plaintiff alleged that the social worker had purposefully misquoted interviewees and falsely reported witness contacts*. Id.* at 1111–12. Relying on *Devereaux*, we held that "deliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake." *Id.* at 1108; *see also id.* at 1111, 1114–15.

But our holding in *Costanich* was limited to the plaintiff's substantive due process claim, effectively based on a right to raise foster children. *See id.* at 1110 (framing the issue as a "substantive due process claim" based on plaintiff's alleged deprivation of her "property and liberty interests in her foster care license and in the care of E. and B. as their dependency guardian"). We also did not decide if such a substantive due process right was in fact viable. We instead assumed that the right existed because the defendants did not dispute it and had waived any argument otherwise. *Id.* at 1110, 1114 n.13, 1116 n.15; *see also Hardwick v. County of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017) (discussing the waiver in *Costanich*).

When it came to the *Costanich* plaintiff's *procedural* due process claim, however, we had little difficulty rejecting it: the plaintiff had already "benefitted from multiple layers of administrative and state court review and, therefore, cannot allege that she is a victim of 'lack of process.'" 627 F.3d

at 1117. It is that same basic logic that we apply here in rejecting Miranda's procedural due process theory.

\*   \*   \*

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**